# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ROBERT D. HUBER, JR.**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-cv-1380 (TSC) |
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Robert Huber sued the United States, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq.* ("FTCA"), for damages arising from injuries that he allegedly sustained when a Government Services Administration ("GSA") vehicle hit his vehicle while driving across Memorial Bridge on May 14, 2012. The government filed a counterclaim, claiming that Huber's negligence was the cause of the accident.

The court conducted a five-day bench trial from January 22, 2018 through January 26, 2018, and the parties filed proposed findings of fact and conclusions of law on March 28, 2018. ECF Nos. 47 and 48.

Based upon the evidence presented at trial and submitted by the parties, the court makes the findings of fact and conclusions of law set forth below. Based on these findings of fact and conclusions of law, the court concludes that Plaintiff has sustained his burden of proof on his negligence claim, and enters judgment in favor of Plaintiff.

Specifically, the court finds that Plaintiff has carried his burden of establishing by a preponderance of the evidence that the driver of the GSA vehicle acted negligently in causing the collision between the GSA vehicle and Plaintiff's vehicle. The court also finds that Plaintiff has established by a preponderance of the evidence that the accident was the proximate cause of at least some of his injuries, and that the government has not carried its burden on its counterclaim. However, because the parties submitted insufficient evidence and briefings on the issue of damages, the court orders the parties to submit supplemental briefing on this issue. Plaintiff's brief is due on May 16, 2019, Defendant's response is due on June 17, 2019, and Plaintiff's reply is due on July 1, 2019.

## I.  FINDINGS OF FACT

### A.  Circumstances Surrounding the Accident

#### i.  *The witnesses and their credibility*

1. Five witnesses testified about the facts and circumstances surrounding the accident: (i) Plaintiff Robert Huber; (ii) GSA vehicle driver Ernest Gilbert; (iii) GSA vehicle passenger Paul Chapman; (iv) Plaintiff's collision expert David Plant; and (v) Defendant's collision expert Dennis Guenther.

2. The court finds that Robert Huber's testimony about the accident was credible.

3. The court finds that Paul Chapman's testimony about the accident was credible.

4. The court finds that Ernest Gilbert's testimony about the accident was not credible because he admitted he had a poor recollection of the events in question, and that lack of recollection was apparent in his testimony.

5. The court finds that David Plant's testimony was credible.

6. The court finds that Dennis Guenther's testimony was only partially credible.

## ii. *The accident*

The court makes the following findings of fact regarding the May 14, 2012 accident.

1. Plaintiff Robert Huber was driving his Toyota SUV from his home in Silver Spring, Maryland to work at Ronald Reagan Washington National Airport in Arlington, Virginia, having left home at approximately 10:00 a.m.  Tr. 76:18-77:22.

2. GSA vehicle driver Ernest Gilbert and passenger Paul Chapman were test driving a route for the Joint Improvised Explosive Device Defeat Organization ("JIEDDO") from the JIEDDO office in Arlington, Virginia to the area around 23rd Street Northwest in Washington, DC and back.  At the time of the accident, Gilbert and Chapman were returning to the JIEDDO office.  Tr. 386:10-17.

3. At approximately 11:00 a.m., the GSA vehicle and Huber's vehicle collided on the traffic circle west of Memorial Bridge in Washington, DC.  Pl. Ex. 3; Tr. 384:11-385:10.

4. At the time of the accident, the roads were wet.  Tr. 78:11, 342:10, 385:5.

5. At the time of the accident, Huber's vehicle was traveling at approximately 30 miles per hour in the far left lane.  Tr. 79:2, 88:1.

6. Huber was wearing his seatbelt at the time of the accident.  Tr. 98:21-23.

7. The GSA vehicle was traveling one lane to the right of Huber's vehicle.  Tr. 348:11-13.

8. A solid white line separated the lanes in which Huber's vehicle and the GSA vehicle were traveling.  Pl. Ex. 29-E.

9. Immediately before the accident, Chapman was looking at traffic on his Blackberry device.  However, he noticed that Huber's vehicle had come from the rear left-hand side of the GSA vehicle.  Tr. 387:17-18, 400:23-401:1.

10. Dr. Plant's Monte Carlo analysis shows that immediately prior to the accident both vehicles were crossing Memorial Bridge towards Memorial Circle. Tr. 157:10-17.

11. This means that Huber was not subject to a Yield sign, which applies only to traffic coming around Memorial Circle. Tr. 348:15-17.

12. The accident involved an impact between the left side of the GSA vehicle and the right side of Huber's vehicle as the GSA vehicle changed lanes. Tr. 84:22-85:8, 400:25-401:1. The damage to both vehicles was consistent with a sideswiping accident due to a lane change.

13. Following the accident, Huber slowly braked his vehicle to a complete stop near the left-hand shoulder. Gilbert stopped next to Huber in the GSA vehicle. Tr. 86:7-8, 378:8-10; Pl. Ex. 3.

14. All parties got out of the vehicles and checked to make sure no one was injured and for damage to the vehicles. There were no apparent injuries at the scene of the accident. Tr. 89:12-21, 399:11-12.

15. The GSA vehicle had damage to the driver's side mirror and driver's side front fender. Tr. 90:9-12, 395:5-10.

16. Huber's vehicle had damage along the passenger side, including a missing fender and scratches. 90:1-8, 396:4-7, Pl. Ex. 5.

**B. Huber's Alleged Injuries**

i. *The witnesses and their credibility*

1. Five witnesses testified about Huber's injuries: (i) Huber; (ii) Plaintiff's expert Susan Montgomery, a social worker; (iii) Plaintiff's medical expert Dr. Marianne Talbot, a rehabilitation specialist; (iv) Plaintiff's acquaintance, Keith Kreger; and (v) Defendant's medical expert Dr. Jack Spector, a neuropsychologist.

2. A sixth witness, Plaintiff's medical expert Dr. Henry Kaminski, a neurologist, testified via video deposition.

3. The evaluations of seven other medical experts were introduced through exhibits at trial: (i) Dr. James Yan, Pl. Ex. 16; (ii) Dr.

Marilyn Kraus, Pl. Ex. 23; (iii) Dr. Heechin Chae, Pl. Ex. 24; (iv) Dr. Barry Ekdom, Def. Ex. 24; (v) Dr. Mark Sementilli, Def. Ex. 25; (vi) Dr. Jessica Clark, Def. Ex. 26; and (vii) Dr. Stephanie Johnson, Pl. Ex. 19.  However, these seven experts did not testify, were not subject to cross-examination, and the court finds that their reports are not as probative as the testimony of testifying witnesses.

4. The court finds that Huber largely testified credibly about his injuries, although the court also finds that he had pre-existing psychological issues that may have been exacerbated by the accident.

5. The court finds that Montgomery, Dr. Talbot and Dr. Kaminski testified credibly about Huber's injuries.

6. The court finds that Dr. Spector's testimony was not credible.  Dr. Spector did not review all the medical records and appeared to have formed a conclusion without consulting all the relevant evidence.  In a separate case, Dr. Spector's testimony was found by another court to be "highly suspect."  *United States v. Davis*, 611 F. Supp. 2d 472, 499 (D. Md. 2009).  "The Court finds [Dr. Spector's] analysis conclusory, unduly dismissive of the wealth of information contained in the voluminous historical records, and methodologically unsound."  *Id.*

ii. *Plaintiff's injuries*

The court makes the following findings of fact regarding Huber's injuries:

1. After he left the collision scene, Huber went to work, where he collapsed, briefly lost consciousness, and was transported by emergency medical personnel to George Washington University Hospital.  There, Huber presented with abdominal pain, vomiting, headache, and an altered level of consciousness.  He was discharged from the hospital two days later.  Tr. 93:15-25; Pl. Ex. 9, HUB-GWUH 321-22.

2. Huber was again admitted to George Washington University Hospital overnight on May 24, 2012 with complaints of an extreme headache, memory impairments, and double vision.  Pl. Ex. 10, HUB-GWUH 247-48.

3. On June 5, 2012, Huber saw neurologist Dr. James Yan. Dr. Yan's notes indicate Huber had significant post-traumatic symptoms. Pl. Ex. 16.

4. On June 22, 2012, Huber was admitted to George Washington University Hospital overnight for a third time, after he displayed altered medical status and gait at a bank. He presented with headache, numbness, tingling, dizziness, and weakness. During this visit, Huber was seen by Dr. Kaminski, who concluded that Huber's reported symptoms were those of post-concussion syndrome, and that these symptoms were related to the May 14, 2012 car accident. Dr. Kaminski later concluded that Huber was suffering from additional psychological problems, but Dr. Kaminski did not make a finding as to whether the psychological problems were primary or a result of the concussion. Pl. Ex. 11A, HUB-GWUH 124-32, 151; Kaminski Dep. 12-13, 42.

5. Huber continued to see Dr. Kaminski through September 2013. Kaminski Dep. 41-42.

6. Beginning in April 2014 and continuing through December 2016, Huber was treated by two brain injury specialists: Dr. Marilyn Kraus and Dr. Heechin Chae. Pl. Ex. 23; Pl. Ex. 24.

   a. On April 3, 2014, Dr. Kraus diagnosed Huber with post-concussion syndrome related to the May 14, 2012 car accident. Dr. Kraus later stated that she believed that Huber's post-concussion syndrome had multiple causes, with stress/psychological and functional factors playing a role, and that it was unlikely that Huber's original injury was causing the degree of disability that he was reporting at that time. Pl. Ex. 23, HUB-NRH 30; Def. Ex. 36, HUB-GWMFA 69.

   b. On May 22, 2015, Dr. Chae likewise diagnosed Huber with post-concussion syndrome. Pl. Ex. 24, HUB-CHAE 10.

7. Huber had three neuropsychological tests performed on him. Neuropsychological testing looks at cognitive issues and does not address physical symptoms. The first test was performed by Dr. Ekdom upon referral by Dr. Kaminski on August 21-22, 2012, the second test was performed by Dr. Sementelli on July 10, 2013, and the third test was performed by Dr. Clark upon referral by Dr. Kraus on March 23, 2015. The tests generally indicated that Huber

suffered a mild to moderate traumatic brain injury but that his symptoms also had some psychosomatic effects. Kaminski Dep. 32; Def. Ex. 24, Def. Ex. 25, Def. Ex. 26.

   a. Dr. Ekdom's test results indicated "a concern for a significant psychological component that compromised thorough assessment." Dr. Ekdom had concerns about Huber's motivation during testing, and stated that the validity of the testing results was limited due to these concerns about Huber's motivation. Kaminski Dep. 33; Def. Ex. 24, HUB-EKDOM 8.

   b. Dr. Sementilli indicated in his report that Huber likely suffered a concussion as a teenager. Dr. Sementilli reported that it appeared that Huber had an acquired brain injury of mild to moderate severity. However, Dr. Sementilli also stated that it appeared that there were psychological and/or personality features that strongly contributed to the persistence of Huber's symptoms and that, therefore, most of Huber's presentation was not traumatic-brain-injury related in nature. Dr. Sementilli likewise had concerns about Huber's performance and the validity of the results. Def. Ex. 25 HUB MSPHD 9-11.

   c. Dr. Clark noted that Huber reported several psychosocial stressors, as well as a history of significant psychological difficulties. Dr. Clark stated that Huber presented with an atypical course of recovery and that it would be "important to explore additional factors that may be contributing to Mr. Huber's symptoms," but noted that these factors may have been created or exacerbated by Huber's concussive injury. Dr. Clark also stated that it was important to explore in psychotherapy the possibility that Huber was being hypervigilant for neurologic symptoms to ensure that there is no potential misattribution of symptoms. Def. Ex. 26 HUB-NRHPC 32-35.

8. Ms. Montgomery, who provided psychotherapy to Huber, diagnosed him with a mood disorder due to a traumatic brain injury. Tr. 22:12-21. She noted that post-concussion syndrome can cause a mood disorder. Tr. 23:13-16. Huber discontinued treatment for several months at the start of treatment but later recommenced treatment. Ms. Montgomery noted that this behavior is a common problem for individuals with traumatic brain

injuries. Tr. 40:2-10. Ms. Montgomery testified that more likely than not, the injury affected Huber's depression and anxiety. Tr. 52:16-24.

9. Dr. Stephanie Johnson, a licensed neuropsychologist, treated Huber throughout 2013 with cognitive behavioral therapy to improve his cognitive functioning. In an undated memorandum, Dr. Johnson noted that Huber was diagnosed with cognitive impairment not otherwise specified associated with a traumatic brain injury, generalized anxiety disorder, and other unrelated diagnoses. Pl. Ex. 19, HUB-COGSOL-12.

10. Dr. Talbot testified that her observations of Huber were consistent with someone who had experienced post-concussion syndrome. Tr. 56:22-24.

11. Mr. Kreger testified that he had known Huber for approximately 20 years, and that after the accident, Huber became more subdued. Kreger further testified that he noticed that Huber had coordination problems after the accident. Tr. 141:22-24, 142:14-20, 143:1-9.

12. The court finds that following the accident on May 14, 2012, Huber suffered from post-concussion syndrome and a mood disorder due to the post-concussion syndrome.

13. The court further finds that Huber experienced headache, sleep disturbance, cognitive difficulties, difficulty concentrating, balance and gait issues, memory impairment and dizziness as a result of the accident.

14. The court also finds that although some of Huber's psychological problems predated the accident on May 14, 2012, the accident exacerbated those problems or created new ones.

15. The court finds Dr. Spector's testimony not to be credible. Dr. Spector did not review Dr. Chae's records while completing his report, but only reviewed them shortly before testifying. Furthermore, Dr. Spector, who had previously been criticized by the court in an earlier case, never reviewed the records of several other providers who had previously treated Huber, nor did he review the notes or deposition testimony of any lay witnesses who knew Huber before and after the accident. Tr. 261:11-15, 261:20-263:17.

## II. CONCLUSIONS OF LAW

1. Under the FTCA, negligence cases such as this one are governed by the law of the state in which the claim arose. *See* 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 5-7 (1962). Because the accident occurred in the District of Columbia, the District's law governs.

2. "In order to show negligence, a plaintiff must establish, by a preponderance of the evidence, the applicable standard of care, a breach of that standard by the defendant, and a causal relationship between the breach and the plaintiff's injury." *District of Columbia v. Price*, 759 A.2d 181, 183 (D.C. 2000) (citing *District of Columbia v. Wilson*, 721 A.2d 591, 597 (D.C. 1998)).

### A. Whether Defendant's Negligence Caused The Accident

#### i. *Standard of care*

1. In the District of Columbia, an individual who drives on a public roadway must "use ordinary care at all times" to avoid collisions with other individuals on the roadway. *Lyons v. Barrazotto*, 667 A.2d 314, 321 (D.C. 1995). Ordinary care is defined as using the "'attention or skill that a reasonable person would use under similar circumstances.'" *Butts v. United States*, 822 A.2d 407, 416 (D.C. 2003) (quoting Standardized Civil Jury Instr. for the District of Columbia, No. 5-2 (2002 rev. ed.)).

2. "Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that such movement can be made with safety." D.C. Code Mun. Regs. tit. 18, § 2201.6(a).

3. Where there is a solid white line marking dividing the lanes, lane changes are discouraged. U.S. Dep't of Transp., Fed. Highway Admin., Manual on Uniform Traffic Control Devices (2009), Ch. 3B § 3B.04, White Lane Line Pavement Markings and Warrants, https://mutcd.fhwa.dot.gov/htm/2009/part3/part3b.htm.

4. The court finds that Gilbert was required to ascertain whether it was safe to change lanes. The court also finds that Huber could assume that Gilbert would yield when changing lanes. Huber also

had the duty to exercise reasonable care as a normal driver would when another vehicle was changing lanes.

ii. *Breach of duty*

Based on the evidence presented, the court finds the following:

1. Huber's vehicle was one lane to the left of the GSA vehicle driven by Gilbert.

2. A solid white line separated the two lanes.

3. Gilbert changed lanes in an area where lane changing is discouraged, i.e., an area with a solid white line marking.

4. The damage to the vehicles is consistent with a collision occurring during a lane change.

5. Huber's vehicle was coming from the left rear of the GSA vehicle immediately prior to the accident.

6. Huber was driving within the speed limit of 30 miles per hour on the roadway and was wearing his seatbelt.

7. Huber has shown by a preponderance of the evidence that Gilbert's negligent breach of duty in failing to adequately determine that it was safe to change lanes was the proximate cause of the accident.

8. Huber has shown by a preponderance of the evidence that he was exercising reasonable care while driving.

**B. Whether the accident was the proximate cause of Huber's injuries**

1. For an accident to be the proximate cause of a plaintiff's injuries, (1) the injuries must be foreseeable; (2) the injuries must be the natural and probable consequence of the negligence; and (3) the negligence must have played a substantial part in bringing about the injuries. *Sanders v. Wright*, 642 A.2d 847, 849-50 (D.C. 1984) (citations omitted).

i. *Foreseeability*

1. Injuries, including traumatic brain injuries, are foreseeable as a result of a collision between two cars in a collision.

2.  The court concludes that Huber's injuries were foreseeable.

    ii.  *Natural and probable consequences*

        1.  The court finds that Huber suffered a concussion as a result of the accident and later suffered post-concussion syndrome as a result of the concussion.

        2.  The court concludes that Huber's injuries were the natural and probable consequence of Gilbert's negligence.

    iii.  *Substantial part*

        1.  The court finds that Gilbert's negligence was the cause of the accident and Huber did not act negligently. Huber's injuries were a natural and probable consequence of the accident.

        2.  The court concludes that Gilbert's negligence played a substantial part in bringing about Huber's injuries.

**C.  The Government's Counterclaim**

1.  In order to prevail on its counterclaim, the government must carry its burden in establishing that it was Huber's negligence that caused the accident. Specifically, the government must show that there was a breach of the applicable standard of care, and that this breach was the proximate cause of the government's injuries. *See Price*, 759 A.2d at 183.

2.  The court has concluded that, based on the evidence presented, Huber was exercising reasonable care while driving. For that reason, the court concludes that the government has not carried its burden on its counterclaim and enters judgment in favor of Huber on the counterclaim.

## III.  DAMAGES

Having reviewed the records and other exhibits provided by the parties, as well as the testimony at trial, the court concludes that not all of Huber's psychological problems have been shown to be the result of the accident. However, the parties' submissions and briefing leave the court unable to reach a conclusion as to an appropriate quantum of damages. Therefore, both

parties are ordered to submit supplemental briefing on the issue of damages and to provide

suggested calculations, and the basis for those suggested calculation as to the proper award of

damages.  The parties shall cite to the record in support of their calculations.

Date:  April 16, 2019


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge